May it please the Court, my name is Robert Stockman, here on behalf of the National Marine Fishery Service. With me at Council's table is Kristen Monselle, representing the Center for Biological Diversity. I intend to speak for 12 minutes, to leave 4 minutes for Ms. Monselle, and reserve 4 minutes for rebuttal. We ask this Court to reverse the District Court's ruling, and uphold the listing of the Beringia bearded seal as a threatened species under the ESA. First, I intend to sum up the reasonable basis for NMFS's decision. Second, I'd like to address the District Court's clear legal errors. And third, I'll discuss some of the problems with the plaintiff's arguments on appeal. NMFS reasonably found the Beringia bearded seal is a threatened species. NMFS is what you call yourself? NMFS, yes. Unfortunate. I could switch to the service. That's all right. That is a species likely to become in danger of extinction in the foreseeable future, throughout all or a significant portion of its range. The best available science demonstrates that this is a species that requires sea ice for crucial periods of its life, specifically giving birth, weaning its pups, pup maturation, and then malting, which is the shedding of its skin and fur. These occur in very specific periods. 70% of the population engages in these activities in the Bering Sea, which has a very productive prey base for this particular species. Can you focus, as you go through this, to me one of the issues that I want to focus on is what foreseeable future means. I think there's plenty of evidence in this record that the ice flow habitat is threatened. I think there's sufficient evidence that if that's threatened, the species will be threatened. I'm not clear, as a legal matter, what the foreseeable future means. We're talking about 2100 here, I take it. Yes, your honor. I think that is laid out in the M opinion, what the NMFS's view of the foreseeable future is. It's something where you can- Is that a legal question, or is it a factual question? Is it a question given to agency discretion? I think it's a case-by-case determination. It is, of course, informed by the question of foreseeable future, though that isn't a term of particular scientific meaning. This court has recognized that it is fundamentally a somewhat ambiguous term, and that it will be determined on a case-by-case basis. The question here is whether- I guess, let me ask the question differently. How do we review the agency's determination that the year 2100 is the foreseeable future? We know it will occur, so it's foreseeable in that sense, but how do we review that determination? It's fundamentally a scientific judgment call about whether there's credible evidence supporting predicting out to that time period. Can I refine the question a bit? I look at the DC Circuit case involving polar bears, and we know that they validated a projection that was, what, 45 years into the future. As my understanding, the projection of the foreseeable future used to be in that range. Now, in order to find the tipping point that was validated for polar bears in the DC case, now, as my understanding, in order to justify a listing today, you have to push the foreseeable future out, what, another 50 years or so to the end of the century before you reach the equivalent tipping point. Is that an oversimplification? I apologize, but I think it is, Your Honor. The agency doesn't start with the outcome or what is the tipping point. I'm not saying you do. Yes. You're now saying that we will use what we have today, and even though it's less certain and less perfected than what was available for the polar bears, because of the nature of the species and whatever, you have to go out that far in order to, and it seems to me, when you're going out that far, you're going to build in greater uncertainties in what the science today can reliably predict. So, first, I want to emphasize, we don't know what the agency would have determined in the scenario where it analyzes the species under 2050, because that isn't what it found. The agency looked at its modeling. But you're not contending, neither are you contending, that the species is threatened because of the 2050 deadline. We are mentioning that impacts may begin as early as next decade. The minimum ice years will start being harmful soon. It is true that as time goes on, there are more minimum ice years. The ice extent withdraws further, and the problem becomes more extreme. Sure, but in this case, the agency determination was that the relevant year was 2100. It did predict out to 2100, and in some instances, 2095. I'd like to explain why, yes. So, maybe you could have done shorter, but you didn't. So, tell us why, one way or another, whether it's the way Judge Fischer asked it or some other way. I'm not complaining because you extended. I just want to understand the rationale why it's going so far. That seems to be the difficult issue in this case. Can you predict so far into the future? Yes. I think the answer is the agency recognized the uncertainty does increase with time, but as it's become more comfortable with the modeling, it determined that it could predict accurately for sea ice in the Bering Sea, accurately out to 2100. The explanation for the shift to 2100 appears in the record at excerpts, page 99. They laid out several reasons for taking this different approach. First, the trend is the same. So, in the past, we would say, well, there's a divergence in how extreme the problem becomes, but the reality is every model shows the temperatures continuing to increase out to 2100, and the sea ice continuing to decrease out to 2100. So, it's a bit odd to say, here's a threat. We know it gets worse and worse and worse, but we're going to ignore it because it may get this much worse versus somewhat more worse. Second, the evidence shows that the observed rates of sea ice withdrawal are actually greater than were originally predicted, which suggests the models are conservative. Third, we actually approached the models in a different way. We started with the same slate of models that was used in the polar bear case, which are from the IPCC. But Overland and Wang, who are two scientists, worked on a way of adjusting the models and analyzing them in a different way, where you proof them against the past 30 years of performance. So, in the polar bear case, we looked at 10 models, and we used all of them to try to predict. But here, we said, which of the models actually predicted sea ice in the Bering Sea well over the past 30 years? And there were six that did a much better job than the other four, which did a relatively poor job for that region of the ocean. So, when you call out the better models, the six really good models, you get less of a divergence. And that's part of why, whereas in the past, we approached the modeling in one particular way and said, well, it diverges too much, we're not sure. When you start calling out the models and saying, well, which ones are actually doing a good job of predicting the last 30 years, you can get a much more clear vision of what will happen in the future. Can I ask you a question that's related to this? The agency designates the species as threatened, but issues no other regulations, and for the reason that there's no immediate need to do something, right? Yes, that was one of the reasons. Okay, but there's other reasons too, but that's at least one of the reasons. What effect does the issuance of the threatened designation have on the opposing parties in this case? What burdens does it put on them? As far as I know, no direct burdens upon them. If a take regulation is eventually issued or something else is issued, that's challengeable, is it not? Yes. I guess I'm asking a standing question that nobody raises in this case, which I'm trying to figure out what the harm to the opposing parties is merely from issuing the threatened designation when no regulation follows it. Are additional burdens put on them? Well, indirectly, there will be. The thing is that in the future now, the federal government will consult when a federal agency has to authorize something. It will engage in Section 7 consultation about the bearded seal and will avoid jeopardizing the seal. That's a direct result of the listing? That is a consequence of listing as threatened. One upshot of that is that when, for example, we have the oil and gas industry in this case, if they were to, say, want to engage in offshore drilling and bearded seal habitat, that may well lead to a consultation, which in turn... Now, they could then sue over the biop and say... My point is that the consultation... I guess your point is the consultation would not have been otherwise required? The consultation under the ESA would not be required. Okay. Absent the listing. Absent the listing. So there are legal consequences, though, limited. And that's in part because the species is already protected under the Marine Mammal Protection Act. I mean, that was a major reason we didn't issue the protective additional regulation. And I say the government doesn't raise a standing issue, and I suspect that there's enough standing here, but the harm to your opponents from the designation, given the existence of the act, the Marine Mammal Act, strikes me as pretty inconsequential, but maybe enough to give standing. I don't think we're contesting it on it. Okay. We raised it in the district court. We did raise it in the district court. And that's why I was asking why you weren't persisting in that, I now understand your position. Yes. I mean, the harm to them is, in our view, limited or unclear that there will be harm. I do want to quickly, I will sit down in a moment to allow my colleague to speak, but just to quickly finish up on the big question, which is can you predict that far out? I think it's clear that the agency is allowed to develop new modeling approaches and new ways of dealing with models. We don't want to lock the agency into one approach. And here, although there's some disagreement about how precise the models are, the majority of the peer reviewers all agreed that these predictions had basically said what we did was reasonable. It may not be perfect. We can't know with precision exactly what will happen, but it is a reasonable approach to analyzing the data we have available. And what that approach shows is that if we do, that if things continue under the existing regime of the current emissions, this species will be in danger of extinction by 2100. And I don't think that the agency had to ignore the ability to readjust how it deals with its models or stick to just one way of doing things throughout all time, just because initially the approach with the polar bear by a different agency was out to 2050. Okay, so let's suppose there's information, in fact, that the predictions are based on maybe an overly optimistic view as to how fast the warming, or how long the warming will take. It may actually be shorter. So plus or minus, let's say in 10 years, the science has evolved to give you a better idea. I take it there's a mechanism to revisit the listing and either enhance the protections or relax them. People can always petition the agency either to uplist a species. In your scenario, if things became quite dire for the species, it could be increased global warming faster than we thought. It could be a new threat that we aren't yet, like, for example, ocean acidification, which is one of the threats, could become more dire than we thought. A plaintiff could always petition us to review it. We could always initiate that on our own. But similarly, imagine a scenario where the emissions are greatly reduced through new regulatory mechanisms that don't exist today, and the models then show different results. A party could always petition and say, you built this around business-as-usual emissions, the emissions that are likely in light of current regulatory mechanisms. Maybe you should take a second look. And we would take a second look and consider, does the new evidence show a different result? You want to... Yes, thank you. Does the Department of Commerce have jurisdiction over this? Sorry? Department of Commerce makes... They have jurisdiction over marine species, such as the bearded sea. Thank you. Good morning. May it please the court, Kristen Montsell for Intervenor Center for Biological Diversity. I just have two brief points I'd like to make. One is how the precautionary nature of the ESA required the service to list the bearded seal. And the second is the important safety net the listing provides. First, the best available science required the service to list bearded seals as threatened. Bearded seals are in trouble. They depend on sea ice for giving birth, for raising their pups, for nursing their pups. But climate change is melting that habitat and will continue to do so until it's nearly non-existent when bearded seals need it most. As such, the service's decision to list the bearded seal as threatened complies with the letter and precautionary nature of the Act. As this court has found many times, the Act is concerned with protecting the future of a species, not merely the preservation of existing animals, and as such requires reliance on the best available science. Reliance on the best available science rather than perfect data or certainty is in keeping with Congressional intent that the agency take action before a species is conclusively headed toward extinction so there's still time to save it. And that's what happened here. Here, the federal scientists looked at the available data and determined that bearded seals' habitat would melt to such an extent that they'd no longer be able to perform several of their life functions and wouldn't be able to survive as a result. While scientists can't determine the precise magnitude of the population decline or exactly when sea ice will melt that bearded seals will no longer survive... Do we know what the size of the population is today? Excuse me? Do we know the size of the population? It's estimated to be at around 155,000 animals. But while the models all predict, though, that the species will become threatened with extinction in the foreseeable future, because they all predict that, absent intervention, its habitat will be completely gone, bearded seals... What's the evidence in the case with respect to... And I know this is a different case than the normal habitat case. The normal habitat case we see is part of a forest is threatened and there's evidence, however, that the bear or the birds can migrate to the other part of a forest or another forest, but they'll be in the same kind of habitat. Is there any evidence in this case with respect to the ability of the seals to survive in the absence of the ice floe habitat? There is not, Your Honor. The agency looked at what would happen in the future and determined that the bearded seals would be forced to move to further areas that are in the north, but that those areas wouldn't have enough food and would increase conflicts amongst the species and cause other problems such that it would compromise the seals' ability to survive. And that's exactly why they need the protections of the Endangered Species Act now, so that we can ensure their continued survival and their continued recovery. They feed on the bottom, don't they? Excuse me? They feed on the bottom. They do, yes, in shallow waters, so they need... They have to be shallow, right? Yes, they need a certain amount of ice at a certain amount of time in all the right places. What's shallow with how many feet? Generally, 200 meters. 200 meters. And if I could just briefly transition to my second point, which is how the Endangered Species Act provides a substantial safety net to listed species. This act has been incredibly successful at saving species, and that's because of the substantial protections it provides, including the Section 7 consultation process that we've already heard about, including the requirement to designate critical habitat to ensure that the biologically important areas that the seals need most are protected. It also requires that the agency implement a recovery plan for the species, which is a roadmap as to how it can become recovered. But the district court's decision stripped bearded seals of these important protections. Science shows us that the seals need the protections of the ESA, and the agency's well-supported decision to list the bearded seal as threatened was the right one under the law and should be reinstated. Thank you. Thank you, counsel. There's about two and a half minutes for rebuttal. We'll hear from the Alaska Oil and Gas Association at all. Good morning. May it please the court. My name is Tyson Cotta, and I represent the North Slope Borough Arctic Slope Regional Corporation, Northwest Arctic Borough, Nano Regional Corporation, and the Inupiaq Community of the Arctic Slope. They are the local government, Alaska Native Regional Corporations, and regional tribal government in northern Alaska. They represent the Alaska Native people, who are the original inhabitants of the Arctic and who depend upon bearded seals for subsistence and cultural purposes. Also at counsel table today is Jeff Lepo, representing the Alaska Oil and Gas Association and American Petroleum Institute. I intend to use 16 minutes of our time. Mr. Lepo, who will follow, will use four minutes. Brad Mayen, representing the state of Alaska, is also here. He's available to answer any questions, but he does not intend to make a presentation today. In my presentation, I plan on addressing two points, demonstrating why the listing of the bearded seal was arbitrary and capricious. I think one of the things that would be helpful to know is what George Hurwitz raised. What is the burden on the effect on your clients of having the listing? The listing decision affects our clients in several different ways. First, the listing allows the National Marine Fisheries Service to impose restrictions on subsistence harvest. It also, through Section 7 in the consultation process, imposes additional burdens on any activity that has a federal nexus. So that would be cooperative management agreements for subsistence harvest, research permits, community development projects such as seawall construction, water treatment plants, airports, things of that nature. Can I ask you what your burden is in this case? And I ask the government that. Let's assume that some scientists have testified, based on their modeling, that this species is threatened by the year 2100. That seems a long way out, but scientists have said they can foresee that point in the future. What do you have to convince us? What burden do you have to convince us that that was arbitrary and capricious? If there's evidence in the record that says that, don't we have to defer to the agency on that? The court will defer to the agency, but our point is that the evidence isn't in the record. I must admit I'm not a scientist, and I don't understand the modeling perfectly, but I do understand that there are models in the record from scientists, Wang and another one, who say, our models can work this out to the year 2100, and everybody agrees there's global warming, or at least that there's warming. No, we don't contest that. You don't contest that correctly. Over time, the ice flows are going to become less available, and they say we can look out to this point in time, and that's the point in time when we think it will reach our tipping point, if you will, as Judge Fisher said. Why aren't we required to say there's credible evidence for the agency to reach that conclusion? I think it's helpful to look at the listing based on its component pieces. To list a species, first the agency has to demonstrate that there is a threat, and those threats are laid out in Section 4 of the ESA. Once they do that, they have to demonstrate that that threat will have an effect on the species, and that's informed by this court's decision, Defenders of Wildlife, also District Court in CBD v. Luchenko. Once they establish that there is an effect, they have to establish that that effect will have such a magnitude that the species is likely to become in danger of extinction in the foreseeable future. So that demonstrates that the effect must be so great that the population will essentially become on the brink of extinction. At some point in the foreseeable future. Right, which in this case would be the end of the century. Right, so as I see the evidence in this case, nobody disputes that for whatever reason, warming will diminish the existing ice flows. Correct? That's correct. And nobody disputes that the ice flows are the habitat of the species. That's correct. Grim and Seal are known to be an ice hobby. Right, and that they do many important things consistent with their survival on the ice flows. And at least there's some evidence that this confluence of things will threaten the species with extinction by the year 2100. What am I missing? What I think you're missing is that the agency has just identified the threat, which is the projected loss of sea ice. They haven't identified any connection to what actually that would mean for the population of the species and how significant any effect would be regarding magnitude, which would go to the extinction threshold. Well haven't they, don't they have substantial evidence that the species performs essential functions on the ice? Yes, but they assume then based on that evidence that it's somehow self-evident that a loss of a portion of that habitat equates to extinction. And we know based on the record... That's why I asked the second council about this issue. They also have evidence that the fewer ice flows that are available, if you will, farther to the north, will mean that the species will be competing for space and food in a very limited area. And that will cause difficulties. So tell me, where do you think the precise deficiency in the agency's record exists? It's just because they assume that it's somehow self-evident that a loss of habitat equates to extinction. And we know for some ice-obligate species like polar bear, the observed rate of sea ice decline has already had an effect. Here the agency has acknowledged that there is no adverse effect on bearded seal despite years of sea ice decline that we've already observed. In fact, the species is known to be currently abundant, widely distributed throughout its range, and healthy. So that demonstrates there's not a direct correlation between ice loss and species survival. We also know that the species has survived for 11 million years and that there have been numerous widespread, prolonged, and rapid periods of global warming that have occurred. So again, it demonstrates that there's not a direct correlation between sea ice loss and bearded seal survival. What the agency needed to do was look at sea ice decline and make a reliable prediction about what the effect would be to the species and make a reliable prediction of what the magnitude would that be to determine whether it's at the extinction threshold. And I think there's nothing in the administrative record demonstrating how, when, or to what extent that effect would be or whether it's even foreseeable. I mean, for example, the record specifically states that NIMS has no statistically rigorous inferences about how bearded seal would respond to habitat loss over time. There's a complete lack of quantitative information linking environmental conditions to bearded seal biteroids. Predicting demographic response to environmental change is largely impossible. So this situation isn't like what we had with the polar bear listing, where the agency was able to link sea ice decline to effects on the population through various studies and then link the effect on the polar bear to status based on population modeling. Here all we have is information on sea ice loss. And even that, it's only in a portion of the range, which is... So you don't think they can take any action until they've completed these studies or somebody's completed these kinds of studies? Right, I don't think the best available science obligation gives them the authority to act without data to support the conclusions. So we recognize that they have data on the threat component, but they essentially acknowledge throughout the administrative record that they lack adequate data to make reliable predictions about the other two components, the effect and the magnitude. So what data from your perspective do they need? What kind of studies do they need? Well, I would say the polar bear listing decision was informative.  And it's survival and reproduction and what that would mean. And then they had population modeling studies that looked at the future population at different increments out 100 years. And so based on that evidence, the court upheld the listing. How certain are we about the size of the population today? There is some uncertainty, but the best estimate that we have is 155,000 animals in the Beringia distinct population. I think there are like a million worldwide. But those are not the population that we're specifically talking about here. And so turning to the magnitude piece, one court has said that the phrase, in danger of extinction, equates to on the brink of extinction. So to determine whether a species will get to that point, the agency needs to be able to assess the magnitude of any impact, what future population trends would be, and what the future status of the species would be. And again, the administrative record doesn't contain any of that information. On the contrary, it says that the agency couldn't make that prediction or that it was too uncertain. The agency simply points to the biological review team's demographic risk assessment to fill the gap. But that is just essentially a numerical ranking of scientists' predictions of what may happen in the present and future based on certain risks to components of the species, like abundance, diversity, productivity, and spatial structure. There's nothing in that explanation to demonstrate or support or provide any data regarding the accuracy or reliability of the future risks. It's just a number. That number doesn't explain what the likelihood of occurrence of the risk would be, what the magnitude of the risk would be. There's nothing connecting those numbers to the ESA listing criteria. Turning to my second point, which was the foreseeable future. Before you leave that point, I want to ask, you don't contest that the habitat is threatened if the species is not threatened. You contest whether the species is threatened, but you don't contest that the habitat is threatened. Yes, that's correct. We recognize that the habitat is threatened. And I know our cases say that that's not enough. You need to show that the diminishment of the habitat gives rise to a threat to the survival of the species. Yes. But in a case where the habitat is sea ice and you don't contest that the habitat is being threatened, isn't that a natural inference? In other words, I was trying to contrast it with diminishing the size of a forest  but here what we're really saying is the habitat itself is going to be so constrained that there won't be an ability to survive. Is that a different kind of analysis? Well, I was going to say, actually, I think what is projected to happen is almost exactly like your forest analogy. The Bearded Seal's habitat is the Bering Sea, East Siberian Sea, Beaufort Sea, Chukchi Sea. NIMS acknowledges that that habitat is going to be there in sufficient quantities out to mid-century. Sometime after mid-century to the end of the century, there's expected to be a decline or loss of just the Bering Sea component. And NIMS recognizes that its models likely understate the timing of that. So it may be problematic years or decades before it actually occurs. But the end result is we're really only talking about a potential loss or a predicted loss of the Bering Sea portion. So your position is that they haven't demonstrated that the population won't simply move to the other portions and continue, perhaps in lesser numbers, but not threaten with extinction? Right. That's exactly right. I mean, these are highly migratory species that are known to move throughout the basin following ice. So the agency hasn't demonstrated that, you know, since we know based in most years they will have habitat remaining, whether they're at that extinction threshold point. How does the extinction threshold point get established? I know you wanted to move to that next, but how does it get established? Well, I mean, it's not a defined term in the Endangered Species Act itself. Right. But the act does require that the species be threatened with extinction. Right. And the act says to be listed as threatened, it has to be likely to become endangered of extinction within the foreseeable future. So I think each species is going to have a different point at when it becomes endangered of extinction. You know, here they said that they lacked sufficient data to make that determination. So we don't really know what the threshold is for this species. They just assume that based on a loss of habitat, it's going to get there. But there's no scientific information kind of connecting the dots to give that explanation. So going to the foreseeable future and the change in duration, in the two previous listing decisions that the agency made for seals, the ribbon seal in 2008 and the spotted seal in 2010, the agency looked at climate projections from the IPCC, the same ones that are underlying this decision, and said that they're too unreliable and too variable for use beyond mid-century. So they cut the foreseeable future off at 2050. Here in the bearded seal decision, they're relying on the same climate projections, but they change course and say the foreseeable future now goes to the end of the century. But they give a reason for changing course. Does that make their decision arbitrary? I know it gives you an argument, but they say, well, our scientists are now better at this than they used to be. Our modelers are better. I think to determine whether it's arbitrary and capricious, you have to assess whether the explanation is reasoned. And in this case, they point to the Wang and Oberlin study. However, if you look at the final rule, that study and that explanation isn't given for the change in foreseeable future. That's emphasized in the reply brief, so it's post hoc. If you look at it from a substantive perspective, they also fail to mention that in the 2010 spotted seal study, the agency also relied on the Wang and Oberlin study, in fact, very heavily. That's how they made their modeling projections to support the 2010 decision. And even then, based on the application of Wang and Oberlin, they still concluded that the projections were too variable for use beyond mid-century. So raising that study now doesn't address the underlying contradiction regarding the adequacy of the modeling for a foreseeable future. And I wanted to point out that that foreseeable future period is important because it determines the window of time in which the agency will make a decision regarding whether to list the species. And as the solicitor of the interiors pointed out, the agency needs to make reliable predictions about the threat and reliable predictions about the effect. So that change is very significant here because it affects, as you've noticed, the window by which we have to understand the status of the species going forward. So I just would like to touch on the other explanations that they made for changing. I think they mentioned that it's a more threat-specific approach. But again, that explanation doesn't address the change. It's essentially meaningless because we're dealing with the same threat, the same underlying data in the same area. It may explain changes based on different threats, but we're dealing with the same ones, so it doesn't address variability. I think before, NIMS also mentioned that warming will continue throughout the century and the trend is clear and unidirectional. They made these exact same observations in the ribbon-seal decision and the spotted-seal decision. So these aren't new discoveries or new science. They've known this for years. And then finally, I think in their reply brief, they mentioned the Douglas 2010 study, mentioning the suggestion that climate projections are conservative, that it may be happening sooner. That explanation was also recognized in the spotted-seal decision. So again, they've added no new explanation or any acknowledgement or addressing that underlying contradiction between the reliability of modeling projections from 2050 to the end of the century. They just reiterate observations they've made in the past but already rejected. So unless you have any further questions, I will defer to Mr. Lepow. That's fine. Thank you very much, Your Honors. Thank you. Good morning, Your Honors. Jeff Lepow. I want to come back to Your Honor's point about natural inference, whether it's inherent because this is an ice-obligate species. It's a natural inference that it's endangered if ice is receding. So first of all, emphasize ice is receding. It's not disappearing. As the point was made here, there's going to be ice acknowledged to be in the Chukchi, the Beaufort, and the East Siberian Sea in the future out at the end of the century, not in the Bering Sea at certain times of year. We know that all ice-obligate species are not endangered by the fact that ice is receding because NIMS chose not to list the ribbon seal, which is an ice-obligate species, and it chose not to list the spotted seal, which is an ice-obligate species. I'm not sure their failure to list establishes that the species aren't in some danger. They just take them in order. Well, they decided those. I mean, those are cases where they went through the process, they were petitioned by the Center for Biological Diversity, and they made a decision not to list them. In the case of the ribbon seal, that went to court. That's the Lubchenco case, and it was sustained against their argument that a decline in habitat is— But their argument is that they're doing a species-specific analysis, and the ribbon seal and the virgin seal have different life patterns and use patterns. And I agree with that, Your Honor, except my point is to address your inference. That's the question that I'm asking, really. Is there—given what we know about the life of this species, how it exists, can we draw a natural inference where we might not be able to draw it for some other species? So the answer to that, again, is no. And here's a couple of things that we know. First of all, climate change is already affecting ice. Ice recession is occurring. The polar bear is an example of a species where we see effects already, and so we know that it is threatened by it. We don't see any of that. The record is clear that there's no evidence currently of any effect from sea ice recession, which has been going on for some time and which is substantial. No effect whatsoever on the health, survival, reproductivity of the bearded seal. Second, bearded seals have been around for 11 million years, and as NIMS has acknowledged, through periods of global warming and global freezing, and both rapid and slow. And so that species has persisted over a long period of time through periods of change. And so it is not inherent. In fact, it's obvious that it has been resilient to changes in the sea ice regime over that period of time. It had to have survived. Third, Mr. Stockman started out from the proposition that there's evidence that 70% of the bearded seals whelp and nurse in the Bering Sea at certain times of year, and that their models predict by the end of the century that that area will be ice-free. Let's break that down. That means that 30% of the population is already whelping and nursing in these other areas, and that's 55,000 seals or 50,000 seals. And there's no evidence that those seals are unhealthy or they're having any reproductive problems. Ms. Montsell's argument, which I'd like you to respond to, is that because the natural tendency of this species is to migrate, as the ice in the Bering Sea becomes unsustainable, this population of 155,000 or so will migrate to where the other 30% live, and therefore they will all be fighting for the same ice flows, fish, habitat, et cetera, and that therefore there will be a disaffect. And if this was a small area, that would be a fair point, but the Chukchi Sea, the Bering Sea, and the East Siberian Sea are enormous areas. These are places as large as the United States itself almost put together. I mean, this is not a constrained area. The Arctic Ocean is a very, very large area, and so if we were talking about vernal pools or some other, you know, that's at one end of the spectrum, that would be one thing, but this is not a constrained area, and the record does not show that there will be insufficient habitat for them. It merely shows that they will have to move, and already a third of the population is using that area. This is the difference between habitat preference and a piece of habitat that's essential. It's a preference. Two-thirds of them prefer to go to the Bering Sea. A third of them don't. If it was essential, then none of them would be there, or there would be demonstrations that if they are in other places, they are unhealthy or they're unable to reproduce or they lack a survival. The problem here is there's no evidence that being in other places, and they are in other places, has any significance from a biological standpoint, and that's why they can't connect the loss of habitat to the threat to the species, let alone out to 2100. Just very quickly, a couple other points. Council for Center for Biological Diversity encourage you to apply a precautionary rule. There is no precautionary principle that applies to listing a species. Courts have clearly held, this court, that the default position of all species is unlisted, and there is no hand on the scale in favor of listing every species because if that was true, I mean, every species is subject to some threat. The question is whether it meets the standards in the ESA. Once you are listed, then you're entitled to the presumptions of the ESA to protect you, which is one of the reasons, to Your Honor's original point, about what's the harm here. There's an enormous threat here to the folks, the native Alaskans, the governments and industry that operate in this area, from a species which is healthy and abundant, enlisting it. There are a whole cascading series of regulatory requirements that follow. Even under the MMPA, where it's already protected, when you're listed as a species, then you become a depleted species, which is an enhanced status, which there are other regulatory requirements that follow. If you have an endangered species and you're engaging in an activity, maybe you have to do an EIS instead of an EA. There's a designation of critical habitat, as counsel said, which has its own series of consequences. There's a very serious series of events that occur, and the goal here is, of course, to impede activity, and that's why you list a species that's abundant and healthy at the current time. Okay. Thank you, counsel. You had a few minutes for rebuttal. Thank you, Your Honor. I'd like to start with the issue of the habitat gains and some of the points that I oppose and counsel made. One, there was a statement that the Chukchi Sea would be fine, or at least I think that was the impression. That is not what the models necessarily show. Excerpts of record at page 90 explain that while some years the Chukchi Sea will have sea in it, there are also minimal ice years in which there will be no ice or very little ice in the Chukchi Sea. That's in the excerpts of record, also at page 299. It's simply not true that this is just about the Bering Sea, though that is very significant. Second, the agency specifically considered the issue of habitat gains and losses. This is in the excerpts of record at page 58 through 62, and that was then peer reviewed by two separate peer reviewers. The conclusion was that there will be significant losses in places we know are very good for the species. It's where the majority of them live. It's where they have a very high availability of prey. There will be potential gains elsewhere where there are less of the species or none of them, and the prey scenario, we have no knowledge that the prey will be nearly as good for them. The ultimate conclusion was that we know they're going to lose habitat that's crucial, that they use, and they may gain habitat that may not have the prey, and it may be even worse than that. The peer reviewers reasonably concluded that this put the species in danger of extinction. The species doesn't need to be found to be likely to go extinct. It needs to be likely to be in danger of extinction. We did consider precisely this issue. Talk about the magnitude. The criticism that there's a lot of data on loss of habitat, but a total absence of data, including the, well, there are a couple of points they made in that, but in any event, there's not data to show the impact and magnitude on this species. There's a couple of points there. One I'd like to emphasize is that we don't have much data on quantitative measures, and we also don't have much data on whether the species is currently healthy. They read into the lack of data on these issues and say, well, they are. We acknowledge that we don't know, and under the ESA, we have to act based on the best available science, and we have evidence that crucial habitat will be gone, and we have evidence that the species depends on that habitat, and it seems likely that the species will be in danger of extinction in the foreseeable future. The statute does not require us to determine a particular threshold at which it goes over a tipping point or a particular quantitative measure. Congress didn't include that, and that's part because this is not a species. There are many species like this where they're less studied than the polar bear. There's a lot more data on the polar bear because it's been studied endlessly, whereas this particular species has been studied much less. Just to wrap up on this, because I think it touches on your point, and a point you asked the opposing counsel about, Judge Hurwitz, is what's their burden here? We have evidence. I think under the arbitrary and capricious standard, they have to show that we failed to make a rational connection. I don't think they can show that, or they have to show evidence that our conclusions, our factual findings, are counter to the evidence before the agency, and they certainly haven't shown that. Well, address then the extension from 2050 to 2100. They say you're using exactly the same models. You haven't explained why those same models, which were insufficient in the past to let you get past 2050, are now sufficient to let you get to 2100. I think that's inconsistent with what the record said at pages 98 to 99, where we explained why we switched our models, and I now realize it doesn't specifically cite, unfortunately, the Wang-Overland study from 2009. What it does is walk through precisely what that study says, and explains that we approached the modeling in that way. I understand their confusion. They think we didn't rely on it, but what we did is say, we used to do this, but now we have a different modeling approach, and we walk through that different modeling approach, and why we thought it gave us much better sense of what the 2100 will be than we used to. We did explain why we thought our new modeling approach was preferable to our old one. The underlying study is in the record, and that was one of the core reasons we decided we could predict that far out into the future, is this new modeling approach. I don't think we have to have cited Wang-Overland 2009. It's enough to walk through the reasoning of Wang-Overland 2009, and it's cited elsewhere in the final rule. That is one of the major reasons we switched position, or I don't even know that this counts as a switch of position, but we took a different approach, is because we have developed more expertise and knowledge about the models, and we thought we could do it better this time, and that is a decision within the discretion of the agency. Thank you all very much. Thank you, Counselor. It's a very interesting case. Thank you very much, and your presentations all across the board were excellent. Thank you. And the matter is submitted at this time, and that ends our session for today and for the week here in Alaska. It's been very pleasant. Thank you.
judges: Fisher, Paez, Hurwitz